Joseph DeCristofaro, Plaintiff,

against
Nest Seekers East End, LLC, NEST SEEKERS CORP., NEST SEEKERS INTERNATIONAL, LLC, NEST SEEKERS, LLC, and EDDIE SHAPIRO, Defendants.


35876-11

LIEB AT LAW, P.C.
Attorneys for Plaintiff
376A Main Street
Center Moriches, New York 11934
LEWIS JOHS AVALLONE AVILES, LLP
Attorneys for Defendants
1 CA Plaza, Suite 225
Islandia, New York 11749


Elizabeth H. Emerson, J.

FACTS
In 2011, Nest Seekers was an established real-estate brokerage in New York City that was looking to enter the Hamptons real-estate market. That year, it opened an office in Southampton, followed by offices in East Hampton and Watermill. It had previously opened offices in Bridgehampton and Sag Harbor. The plaintiff, a licensed real-estate salesperson, was employed by a competing brokerage, the Corcoran Group ("Corcoran"), from 2007 until 2011. He was one of Corcoran's top-ten producers on the East End of Long Island, which included the Hamptons. [*2]In April 2011, the plaintiff walked into Nest Seekers' Southampton office and met with the manager there, who arranged for him to meet with Eddie Shapiro a few days later. Shapiro was the president and chief executive officer of Nest Seekers International, LLC, which was owned by Nest Seekers, LLC. Nest Seekers, LLC, was owned by Shapiro and Churchill Corporate Services. Nest Seekers, LLC, was a duly licensed real-estate broker. 
On May 9, 2011, the plaintiff entered into a "Contractor and Association Agreement" ("CAA") with Nest Seekers, LLC. The CAA was signed by the plaintiff personally and by Shapiro on behalf of Nest Seekers, LLC. Pursuant to the terms of the CAA, the plaintiff became an independent contractor/real-estate salesman affiliated with Nest Seekers, LLC. The CAA provided that the plaintiff was to be paid a commission based entirely on sales. The plaintiff, however, did not want to join Nest Seekers simply as a salesman and wanted to be an equity partner with an ownership interest therein. Shapiro suggested that the plaintiff form a group or team of agents that he would recruit to work for Nest Seekers and that he would manage. Such an arrangement would allow the plaintiff to share in the commissions that his team or group brought into Nest Seekers.
The plaintiff entered into a second agreement on May 9, 2011, with the defendant Nest Seekers East End, LLC.[FN1]
That agreement, entitled "Addendum to Contractor Association Agreement" ("ACAA"), was signed by the plaintiff as EVP, Managing Director, and by Shapiro as President and CEO. The ACAA provided that the parties would split commissions 80% to the plaintiff and 20% to Nest Seekers on all exclusive listings, 90% to the plaintiff and 10% to Nest Seekers on all non-exclusive sales and rentals as well as on any deals resulting from leads generated by the plaintiff's website (leasehamptons). In addition, the ACAA provided, in pertinent part, as follows:
"Nestseekers agrees to give Joseph DeCristofaro a 'bonus' or share in commission on new agents brought into the [N]estseekers group of 25% of net earnings of the office and future offices opened together in the Town of Southampton. Net earnings at this time are defined as rent, utilities, allocated real net and hreo costs [FN2] and administrative support [*3]expense.[FN3] 
"On Friday May 13th, 2011, Mr. DeCristofaro will be introduced tothe team under the marketing title of EVP, Managing PARTNER [FN4] and will take over operations and sales leadership for the office listed below.
"The parties shall make best efforts to convert this agreement into an operating partnership agreement formed as [a] single purpose entity for the management and ownership structure of the office located at 20 Main Street Southampton, NY. AND OTHER OFFICES IN THE TOWN OF SOUTHAMPTON INCLUDING BUT NOT LIMITED TOO [sic] WATERMILL BRIDGEHAMPTON, SAGHARBOR, AND NORTH SEA. Said agreement must be signed and agreed to by May 16th, 2011."
It is undisputed that no "operating partnership agreement" was executed by the parties either before the May 16, 2011, deadline or afterward. Moreover, Shapiro was the only party to draft a follow-up agreement. Shapiro had his attorney draft an agreement dated June 23, 2011, which provided, in pertinent part, as follows:
"1. Terms. JD is a New York State licensed Real Estate Agent. JD is hereby retained to serve under the marketing title of Executive Vice President and Managing Director of the Company,[FN5] with the Company's current principal office located at 20 Main Street, Southampton, New York, and with such other satellite or additional offices as from time-to-time shall be agreed upon.
* * *
"2. Payments to JD. In full consideration to JD, the Company shall provide JD with profit percentages ("Profit Percentages") as remuneration, based upon the Company's net profits, as follows:
"A. Exclusives to the Company. Eighty (80%) percent to JD, and twenty (20%) to the Company;
"B. Non-Exclusive Sales and Rentals on Sales Side. Ninety (90%) to JD, and ten (10% ) to the Company;
"C. Website (leasehamptons) Sales. Any transactions concluded which results from leads generated by JD's website—ninety (90%) to JD and ten (10%) to the Company;
"D. Override Commission. In consideration for his management of the Company's agent in the current office and other agreed-upon future offices in the town of Southampton, JD will receive a bonus of twenty (25%) of the profits of the Company on an annual basis.
"As used in this Agreement the term 'net profits' means the Company's earned and paid gross commission, less the Company's administrative costs including rent, utilities, cleaning, MLS, HREO, REAL NET, other listing services, and related overhead and carrying costs directly related to the Company's business, but shall not include advertising, marketing and photography, which the Company will be responsible and pay for."
The plaintiff refused to sign the aforementioned agreement because it was not a partnership agreement, but failed to draft a proposed agreement of his own.
Shapiro had his attorney draft a revised agreement, which was sent to the plaintiff by e-mail on July 15, 2011. In the revised agreement, the foregoing provisions were replaced by the following:
"1. Terms. JD is a New York State licensed Real Estate Agent. JD is hereby retained to serve under the marketing title of Managing Director of the Company, (the other current Managing Director of the Company is Geoff Gifkins), with the company's current offices in Watermill, Southampton, Bridgehampton, and East Hampton, and with such other satellite or additional offices as from time-to-time shall be agreed upon.
* * *
"2. Equity Participation. JD shall receive an "Equity Participation", meaning that in the event the Company is sold or transferred during the term hereof, he will also receive 15% of the net profits from any such sale or transfer directly from the closing proceeds. After the term of this Agreement expires, and both parties deem it to be a successful venture, then they shall mutually enter into a new Operating Agreement providing for a co-membership interest between them (Nest Seekers—70% and JD—15% and the other Managing Director—15%).
The plaintiff refused to sign the revised agreement because it modified the terms of his purported [*4]agreement with Shapiro by reducing his equity interest from 25% to 15%. He again failed to draft a proposed agreement of his own.
In the summer of 2011, the plaintiff took over the management of the Southampton office after the office manager left. Almost immediately, Shapiro began receiving complaints about the plaintiff's management style. The complaints accused the plaintiff of, inter alia, taking listings from other agents, not being available for them, and using the bulk of the office's advertising budget for his own listings. Shapiro testified that the office was chaotic, that people stopped showing up for work, that they threatened to leave, and that the administrators were in tears every other day. In addition, the plaintiff held himself out as a managing partner in advertisements, in newspaper articles, in press releases, on his business cards, and to third parties, despite Shapiro's instructions not to. The plaintiff also failed to transfer his real-estate license from Corcoran to Nest Seekers, as required by the ACAA and state law. Things came to a head on September 30, 2011, when Shapiro sent the following e-mail to the plaintiff, relieving him of his responsibility for the management of the Southampton office, but allowing him to remain with Nest Seekers as a real-estate salesman with the same compensation as before: 
"It's time to discuss what are we doing moving forward with your relationship with the company. You are obviously not content with the way things have been going and neither am I. We seem to have different understanding of what managing the office would be and what the working relationship with the company should be. We have tried to discuss it several times but the day to day experience speaks for itself.
"After numerous attempts and various drafts to create a governing agreement between you and the company, we have yet to hear back neither with a response or negotiations of some sort, nor did you accept any terms. That leaves everything up in the air and we were ok with it for a little while but now we cannot afford to continue this way.
"We have taken four different legal opinions to make sure that neither you or the company has any exposure with our attempt to establish a working relationship on the management side. More so, it has come to my attention that as of about 2 weeks ago, you have never dissolved your association with Corcoran and transferred your license to Nest Seekers....Your draft of the addendum would be the closest thing to some governing document, but without your license with the firm as you stated, now that is not effective either.[FN6]

"Additionally, I have a copy of ads you placed this weekend. You once again list yourself as Managing Partner. In numerous occasions, myself and other members of our [sic] [*5]reminded you that you cannot use that title even though all titles are for marketing use only as it states clearly in our Independent Contractor agreement and company policies manuals and other documents. Again, this has to stop a today.
* * *
"In order for you to continue with the company as agent, you must associate your license with us. You will also have to accept our standard terms of independent contractor agreement if you haven't yet. We would accept the split of 90% on buyers deals and 80% on exclusives and will allow a title of Group leader...which will allow you to maximize your relationship with the firm. You can spin it any which way you want with the press and such.
"That way you can continue to focus your efforts 100% on your own transactions and business with no interference by anyone or having to deal either with their problems or needs. However, you must make a decision that you want to be with the firm and transfer your license to Nest Seekers."
* * *
The plaintiff responded in an e-mail dated October 4, 2011, in which he stated, inter alia, the following:
"I'm not too interested in going backward - who said what, when - other than to point out that we have a signed agreement and while it needs fleshing out, it constitutes our basic working arrangement. Are there details to finalize? Yes, but my own focus is in going forward. To that end, I've only two basic goals:
" 1. We need to review our documents and put the more specific details in writing.
"2. I'm open to changes....
"The truth is that we have a partnership; one we decided on because together, we are greater than the sum of our parts. Building Nestseekers is our joint goal and it's one I think we're both well positioned to achieve but its only going to happen well if we both work within our skill sets and help each other at every juncture. That means we need to understand each other better and work hand in hand. For me that starts with you and I meeting for a sustained amount of time, one on one, to work out the details of the relationship."
On October 31, 2011, Shapiro sent the following e-mail to the plaintiff:
"I guess we have to go over this conversation again.
"1. The document you are referring to was an attempt to create a temporary term sheet.[FN7]

"2. In the first paragraph, you assure that you terminate your association with all other firms yet you continued to associate your license with Corcoran and not with Nest Seekers as well as refused our Independent Contractor agreement.
* * *
"4. A number of drafts in the earlier stages of our conversations were sent to you by council [sic] and you did not respond to neither.
"5. There is no partnership agreement and there is no entity or operating agreements yet established for Southampton office. It is solely owned and managed by corporate office. Our attempt to try and arrive to even a draft of an agreement failed.
* * *
"11. Once again, I am reminding you. Do not use the title 'managing partner.' You are not and it is not authorized.
"Again, there is no partnership agreement....The one page document you are referring to states that we will make best efforts. Those efforts were made and we arrived at nothing. Regardless that document is not valid since you have not transferred your license to Nest Seekers. You have absolutely no interest in managing. You have no time or desire to do so. You don't even have time to meet with me. "Here is a pressing issue that you need to respond to immediately. Your real estate license is still not associated with Nest Seekers. Would you like it to be? [O]therwise, we cannot continue the conversation of you even being part of Nest Seekers. With that said, should you choose to license with Nest Seekers, our standard Independent Contractor Agreement should be signed at the same time.
* * *
"I would again strongly recommend that you abandon pursuing this idea as it was never properly followed upon and most importantly you really have no interest in. [Y]our actions speak for themselves. You have an opportunity to take advantage of an exuberant split and abuse the system to you[r] advantage making transactions happen.
"If you fail to change the title, continue to operate on our behalf with no license and refuse to sign the independent contractor agreement [you] would leave me no choice but [*6]to terminate your relationship with Nest Seekers."
The parties stipulated that the plaintiff left Nest Seekers in November 2011 and that his real-estate salesman's license was disassociated from Nest Seekers on November 11, 2011. This action ensued. 
PROCEDURAL HISTORY
The amended complaint contained 17 causes of action against Nest Seekers East End, LLC; Nest Seekers Corp.; Nest Seekers International, LLC; Nest Seekers, LLC; and Eddie Shapiro for breach of contract, an accounting, unjust enrichment, and defamation, among other things. The defendants answered the amended complaint and asserted three counterclaims for breach of contract and four counterclaims for declaratory judgment. Pursuant to a stipulation dated March 11, 2014, the plaintiff discontinued with prejudice the first, second, fourth, seventh, eighth, ninth, tenth, eleventh, and sixteenth causes of action, and the defendants discontinued with prejudice the first, second, and third counterclaims for breach of contract. In the same stipulation, the plaintiff clarified that, with regard to the third and fifth causes of action, he was seeking an accounting of and a judgment awarding him a percentage of the net earnings of the Nest Seekers offices located in the Town of Southampton and that he was not seeking any unpaid commissions earned by him or any Nest Seekers agents recruited by him. 
The defendants moved for summary judgment on the remaining causes of action and counterclaims. By an order of this court dated October 6, 2014, the motion was granted to the extent of dismissing the sixth, fourteenth, fifteenth, and seventeenth causes of action. The parties were directed to proceed to trial on the remaining causes of action and counterclaims. Pursuant to a stipulation that was so-ordered by the court on September 24, 2015, the plaintiff discontinued the twelfth and thirteenth causes of action and the caption was amended to delete therefrom all of the defendants except Nest Seekers East End, LLC. The parties proceeded to trial on the remaining causes of action and counterclaims: the third cause of action insofar it alleges that the plaintiff breached the profit-sharing provision of the ACAA with regard to Nest Seekers' offices in the Town of Southampton, the fifth cause of action for an accounting of the Southampton offices' profits, and the four declaratory-judgment counterclaims. At trial, Nest Seekers withdrew the fourth and fifth counterclaims, leaving the sixth and seventh counterclaims for judgments declaring that the partnership provision of the ACAA is unenforceable; that no "operating partnership agreement" was entered into; and that the plaintiff is not an owner, member and/or partner of any of the Nest Seekers entities. 
A bifurcated trial on the issue of liability was held on March 7, 8, 9, and 10, 2016. At trial, the plaintiff testified on his own behalf and Eddie Shapiro testified for the defendant.More than 50 exhibits were introduced into evidence. At the conclusion of the plaintiff's case, the defendant moved for a directed verdict. The court reserved decision on the defendant's motion. Post-trial briefs were submitted on or about June 24, 2016.
[*7]ANALYSIS
The question to be decided by the court is whether the plaintiff and Shapiro established a partnership to own and operate a real-estate brokerage within the Town of Southampton. 
At trial, the plaintiff sought to establish that he had formed a de facto partnership with Shapiro, which gave him a 25% equity interest in the Nest Seekers brokerages in the Town of Southampton. According to the plaintiff, the ACAA is evidence of the terms of the partnership, although it is not a complete written partnership agreement and it was to be converted into a formal limited-liability-company operating agreement at a later date.
It is the defendant's position that the plaintiff and Shapiro never formed a partnership. According to the defendant, they entered into an independent-contractor agreement with an incentive-laden addendum that gave the plaintiff a marketing title; better commission splits than he had at Corcoran; and the opportunity to build his own team at Nest Seekers, which would allow him to profit from the sales of the agents that he recruited to his team.
A partnership is an association of two or more persons to carry on as co-owners of a business for profit (Partnership Law § 10 [1]). When there is no written partnership agreement between the parties, the court must determine whether a partnership, in fact, existed from the conduct, intention, and relationship between the parties (Brodsky v Stadlen, 138 AD2d 662, 663). No one characteristic of a business relationship is determinative in finding the existence of a partnership-in-fact (Id.). Factors to be considered by the court include the sharing of profits and losses, the ownership of partnership assets, joint management and control, joint liability to creditors, the intention of the parties, compensation, the contribution of capital, and loans to the organization (Id.).
Profits and Losses
An indispensable element of a partnership is a mutual promise or undertaking by the parties to share in the profits of the business and to submit to the burden of making good the losses (Community Capital Bank v Fischer & Yanowitz, 47 AD3d 667, 668). The plaintiff contends that, because the ACAA provided for the sharing of net profits, after expenses, the parties agreed to share in both profits and losses. 
An employer-employee relationship providing for the division of profits will not give rise to a fiduciary relationship (in this case, a partnership) on the part of the employer absent an agreement to also share losses (Vitale v Steinberg, 307 AD2d 107, 108 [and cases cited therein]). An agreement made by an employer that an employee shall share in the profits of the business as entire or partial compensation for his services is a contract of mere hiring, providing for compensation in a particular manner in order to induce greater energy and faithfulness on the part of the employee (Id. at 109-110). The computation of profits necessarily entails the addition of income and the subtraction of expenditures (Id. at 109). When an employee is not required to [*8]make good on negative amounts, losses are shared in only the broadest sense (Id.). Such an expansive interpretation of losses renders meaningless the distinction between "sharing profits" and "sharing losses," and no trust or fiduciary relation is created (Id. at 109-110). 
The ACAA provided for the sharing of profits only and made no provision for the sharing of negative amounts or losses. An undertaking to share in profits without submitting to the burden of making good the losses renders such an agreement a nullity under partnership law (Chanler v Roberts, 200 AD2d 489, 491). The absence of an agreement to share in losses is fatal to the plaintiff's claim of the existence of a partnership (Id.). Accordingly, this factor weighs in favor of the defendant.
Compensation
Exhibit 51 reveals that the plaintiff was issued an IRS form 1099 for his Nest Seekers' compensation in 2011. A form 1099 reflects payment for services rendered to professionals or independent contractors, not partners, who are issued schedule K-1's for their share of the partnership's income, credits and deductions (see, Silverman v Keller, 2006 NY Slip Op 30662[U] [Sup Ct, NY County]). Accordingly, this factor weighs in favor of the defendant.
Ownership of Partnership Assets
The record does not reflect, nor does the plaintiff contend, that he owned any Nest Seekers' assets.
Capital Contribution, Loans, and Joint Liability to Creditors
The record does not reflect, nor does the plaintiff contend, that he made any capital contributions or loans to the alleged partnership or that he was jointly liable with Shapiro to its creditors. The record reflects that Shapiro invested more than $250,000 to acquire and set up the Nest Seekers' offices in Southampton. The plaintiff paid some expenses for which he was reimbursed. The plaintiff testified that both he and Shapiro loaned $2,500 to another salesman who needed an advance of his commissions. The plaintiff was paid back. Loans of cash by one person to another for the purposes of the business during the existence of a claimed relationship usually negates the notion of a partnership (Brodsky v Stadlen, 138 AD2d at 663). The plaintiff contends that his contribution to the partnership was his skill, effort, and knowledge of the real-estate market on the East End of Long Island, including "open" (i.e, publicly available) listings that he brought with him from Corcoran. The failure of a party to contribute capital, however, is strongly indicative that no partnership exists (Id.). Accordingly, this factor weighs in favor of the defendant.
Joint Management and Control
In support of this factor, the plaintiff relies heavily on his management of Nest Seekers' Southampton office and his role in Nest Seekers' acquisition of a competing real-estate brokerage, Prospective Properties. The plaintiff testified that he suggested to Shapiro that Nest Seekers acquire Prospective Properties and that the he approached its principal broker (Goeff Gifkins) to ascertain if he would be interested in selling. The plaintiff also testified that, after Nest Seekers acquired Prospective Properties, he was a party to the discussions between Shapiro and Gifkins concerning Gifkins' inclusion in a partnership.
The record reflects that the plaintiff's management of Nest Seekers' Southampton office was short-lived and ended with Shapiro removing him as the office manager, which suggests an employer-employee relationship.[FN8]
Moreover, although the plaintiff's conduct in connection with the Prospective Properties deal is consistent with relations between partners, it is equally consistent with relations between an employer and a trusted employee. Accordingly, this factor weighs in favor of the defendant.
Intent of the Parties
While Shapiro may have initially considered forming a partnership with the plaintiff, the parties never came to a meeting of the minds on the issue. An agreement to agree, in which a material term is left for future negotiations, is unenforceable (Joseph Martin, Jr., Delicatessen, Inc. v Schumacher, 52 NY2d 105, 109). The ACAA, by its terms, clearly contemplated the execution of a more formal "operating partnership agreement."
Ordinarily, when the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract. In some circumstances, however, preliminary agreements can create binding obligations (Adjustrite Systems v GAB Business Services, 145 F3d 543, 548 [2nd Cir]). Federal case law classifies preliminary agreements into two categories. Type I preliminary agreements are complete, reflecting a meeting of the minds on all issues perceived to require negotiation (Brown v Cara, 420 F3d 148, 153 [2nd Cir]). They bind both sides to their ultimate contractual objective in recognition that, despite the anticipation of further formalities, a contract has been reached (Adjustrite Systems v GAB Business Services, supra at 548). Thus, one party may demand performance even though the parties fail to produce a more elaborate formalization of the agreement (Id. at 548). Type II preliminary agreements, by contrast, are binding only to a certain degree, reflecting agreement on certain major terms, but leaving other terms open for further negotiation (Brown v Cara, supra at 153). Type II agreements do not commit the parties to their ultimate contractual objective. Rather, they obligate the parties to negotiate the open issues in good faith during their existence (Id.; EQT Infrastructure Ltd. v Smith, 861 F Supp 2d 220, [*9]228 [SDNY]). Moreover, even if an agreement is not a Type II agreement, the parties can contractually obligate themselves to negotiate in good faith (Id.). 
While the New York Court of Appeals has not adopted the Type I-Type II distinction, it has indicated that, when an agreement contemplates the negotiation of later agreements that are a precondition to a party's performance, the parties are required to negotiate the terms of the later agreements in good faith. In IDT Corp. v Tyco Group, S.A.R.L.(13 NY3d 209), the parties entered into a settlement agreement that contemplated the negotiation and execution of four additional agreements. The parties debated whether the settlement agreement was a Type I or Type II preliminary agreement. The Court of Appeals noted that it did not find the rigid classifications of Type I and Type II to be useful, but that it did not disagree with the reasoning of the federal cases (Id. n 2 at 213). It found that the parties were required to negotiate the terms of the additional agreements in good faith (Id. at 214). 
The court finds that the ACAA did not create a binding partnership, but that it did require the parties to negotiate in good faith to come to an agreement on the partnership issue. The ACAA explicitly required the parties to use their best efforts to agree to and sign an "operating partnership agreement" by May 16, 2011. It is undisputed that neither party took any action to enter into such an agreement before the expiration of the May 16, 2011, deadline. When, as here, both parties are equally at fault, the doctrine of in pari delicto, which is analogous to the equitable defense of unclean hands, provides that the defending party is in the stronger position. The plaintiff's participation in the same wrongful conduct as the defendant bars his recovery (Kirschner v KPMG LLP, 15 NY3d 446, 464; Matter of Food Management Group v Rattet, 380 BR 677, 693). Accordingly, there can be no liability for the failure to enter into an "operating partnership agreement" before May 16, 2011. 
After May 16, 2011, the parties were no longer under a duty to negotiate in good faith. The record reflects, however, that Shapiro had his attorney prepare two draft agreements, which he sent to the plaintiff in June and July of 2011. The plaintiff rejected both drafts and did not produce a proposed partnership agreement of his own. Accordingly, the parties never reached an agreement on the partnership issue. 
The plaintiff contends that he held himself out to the public as a partner with Shapiro's approval and consent, which evinces their intent to form a partnership. There is evidence in the record that the plaintiff held himself out as a managing partner in advertisements, in newspaper articles, in press releases, on his business cards, and to third parties. There is also evidence in the record that Shapiro went along with it in public so as not to embarrass the plaintiff, but privately admonished him not to use the title "Managing Partner." 
The plaintiff appears to be making a partnership-by-estoppel argument. The doctrine of partnership by estoppel provides that a person is estopped from denying the existence of a partnership when he, by words spoken or written or by conduct, represents himself or consents to another representing him as a partner in an existing partnership (Partnership Law § 27; [*10]Community Capital Bank v Fischer & Yanowitz, 47 AD3d at 668). Application of the doctrine forecloses the party who has represented himself as a partner from denying the existence of the partnership for the purpose of avoiding the partnership's liability to injured third-parties (Partnership Law § 27; Ads Plus Advertising, Inc. v Ault, 928 F Supp 2d 683, 693 [WDNY], citing JLG Architectural Prods., LLC v WDF, Inc., 87 AD3d 681). However, even when parties hold themselves out as partners to others, it is not proper to characterize them as having a de facto partnership when considering their liabilities toward each other (The Law of Law Firms [2nd] §1:15 [August 2016 update], citing Rossner v Parson, 300 AD2d 102). Accordingly, this factor weighs in favor of the defendant.
Real Property Law § 441-b
Although not raised by the parties, the court notes that Real Property Law § 441-b and 19 NYCRR 175.22 prohibit a licensed real-estate salesman from being a member of, or from owning any voting interest in, a licensed real-estate brokerage that is a corporation, an LLC, or a co-partnership. A license issued to a corporation entitles the president or such other officer as is designated by the corporation to act as a real-estate broker (Real Property Law § 441-b [2]). A license issued to an LLC entitles one member or manager thereof to act as a real-estate broker, and a license issued to a co-partnership entitles one member of the partnership to act as a real-estate broker (Id.). Any other officer, member, or manager who wants to act as a broker must obtain an additional broker's license expiring on the same day as that of the corporation, LLC, or co-partnership (Id.). Thus, when a person licensed as a real-estate salesman becomes an officer of a corporation, a manager or member of an LLC, or a member of a co-partnership that is licensed as a real-estate broker, an application must be made on behalf of the corporation, LLC, or partnership for a broker's license for that person as its representative for the remainder of the then current license term, and the salesman must return the license previously issued to him (Trigoli v Domain Properties LLC, 2010 NY Slip Op 32500[U] [Sup Ct, Queens County]). Moreover, a license as a real-estate salesman cannot be issued to an officer of a corporation, to a manager or member of an LLC, or to a member of a co-partnership licensed as a real-estate broker (Real Property Law § 441-b [2]).
The purpose of Real Property Law § 441-b is to protect the public (Galbreath-Ruffin Corp. v 40th and 3rd Corp., 19 NY2d 354, 362-363), and its provisions clearly show a legislative intent to prohibit the transaction of real-estate business except by persons licensed as required by law (Ohnewald v Craco Constr. Corp., 233 NYS 116 [Lazansky, P.J., dissenting]). The record reflects that the plaintiff was a licensed real-estate salesman when he worked for Nest Seekers and that he did not obtain a real-estate broker's license until after he had left Nest Seekers' employ. He was, therefore, statutorily prohibited from being a member or manager of any of the Nest Seekers LLC's or from having a membership interest in a partnership with Shapiro to own and operate a real-estate brokerage. Accordingly, it would be against public policy and the legislative intent expressed in Real Property Law § 441-b to find that the plaintiff had formed a defacto partnership with Shapiro. 
Conclusion
In view of the foregoing, the court finds that the plaintiff has failed to establish, prima facie, that he and Shapiro formed a de facto partnership to own and operate a real-estate brokerage within the Town of Southampton. Accordingly, the defendant's motion for a directed verdict is granted.
Turning to the counterclaims, the court declares that the ACAA is not an enforceable partnership agreement; that no "operating partnership agreement" was entered into; and that the plaintiff is not an owner, member and/or partner of any of the Nest Seekers LLC's.
Dated: January 11, 2017
J.S.C.



Footnotes

Footnote 1:The plaintiff testified that his partnership with Shaprio was to be formed under Nest Seekers East End, LLC, which was an existing entity formed by Shapiro in 2005. Nest Seekers East End, LLC, was owned by Nest Seekers, LLC, which was owned by Shaprio and Churchill Corporate Services. Shaprio testified that he formed Nest Seekers East End, LLC, for the Hamptons market, but never used it as a business entity, and that all of Nest Seekers' business on the East End of Long Island was conducted through Nest Seekers, LLC.

Footnote 2:As far as the court can determine, HREO is a listing service similar to the Multiple Listing Service.

Footnote 3:This provision, as written, does not make any sense. It defines "net earnings" as "rent, utilities, allocated real net and hreo costs and administrative support expense," all of which are expenses. The court finds that what the parties probably meant to say is that "net earnings" are defined as gross earnings minus the enumerated expenses.

Footnote 4:The draft of the ACAA that Shapiro sent to the plaintiff in an e-mail dated May 9, 2011, provided, "On Friday May 13th, 2011, Mr. DeCristofaro will be introduced to the team under the marketing title of EVP, Managing Director," not Managing Partner.

Footnote 5:"JD" is defined as the plaintiff, Joseph DeCristofaro, and the "Company" is defined as Nest Seekers Southampton, LLC. The plaintiff testified that there was to be a separate LLC for each office and that Nest Seekers Southampton, LLC, was to be the LLC for the Southampton office.

Footnote 6:The "addendum" refers to the ACAA, which required the plaintiff to "disassociate with any other real estate firm and...operate exclusively on behalf of Nest Seekers East End LLC." The parties stipulated that the plaintiff disassociated his license from Corcoran and associated it with Nest Seekers on or about September 15, 2011.

Footnote 7:Referring to the ACAA. 

Footnote 8:The court notes that the plaintiff, a licensed real-estate salesman, was ineligible to manage Nest Seekers' Southampton office. The rules and regulations of the Department of State do not permit a real-estate salesman to operate a branch office, which must be under the supervision of a broker (see, 19 NYCRR 175.20).